**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**REV. DR. GLORYA C.**
**ASKEW,**

                    **Plaintiff,**                    **1:09-cv-553**
                                                      **(GLS/RFT)**

          **v.**

**NEW YORK STATE et al.,**

                    **Defendant.**
_____

**APPEARANCES:**                    **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Rev. Dr. Glorya C. Askew
Pro Se
21 Woodsman Road
Hampton, VA 23666

**FOR THE DEFENDANT:**
HON. ERIC T. SCHNEIDERMAN          ADRIENNE J. KERWIN
New York State Attorney General    Assistant Attorney General
Albany Office
The Capitol
Albany, NY 12224

**Gary L. Sharpe**
**Chief Judge**

## <u>MEMORANDUM-DECISION AND ORDER</u>

### I. <u>Introduction</u>

Plaintiff *pro se* Rev. Dr. Glorya C. Askew commenced this action

against defendants New York State and New York State Department of Correctional Services (DOCS) under Title VII of the Civil Rights Act of 1964,[1] alleging gender, race, color, and religious discrimination and unlawful retaliation. (*See* Compl., Dkt. No. 1.) Askew also brought suit for discrimination and deprivation of her First Amendment rights pursuant to 42 U.S.C. §§ 1981 and 1983 against defendants John Nuttall, Kenneth S. Perlman, Reinaldo Medina, Mary Bogan de Belmonte, Mark Leonard, Omega Alston, Israel Rivera, Charles Harvey, Peter B. Brown, and Mark Miller, in their individual capacities.[2] (*See id.*) Pending is defendants' motion for summary judgment, as well as Askew's motions for judgment on the pleadings and to amend her Complaint. (*See* Dkt. Nos. 68, 72, 84.) For the reasons that follow, defendants' motion is granted and Askew's motions are denied.

## II. **Background**

For the sake of clarity, the court first discusses Askew's allegations, followed by defendants' justifications for its employment actions, and,

---

[1] *See* 42 U.S.C. §§ 2000e-2000e-17.

[2] In a Memorandum-Decision and Order dated January 15, 2010, the court dismissed all claims against defendants Glenn S. Goord and Brian Fischer, and the official capacity claims against the remaining individual defendants. (*See generally* Dkt. No. 11.)

finally, a summary of the events that occurred after this action commenced.

**A.   Askew's Allegations**[3]

Askew, an African-American Protestant minister, began her employment with DOCS in 1984, and has worked as the Protestant Ministerial Program Coordinator (MPC) since May 31, 2001.  (*See* Compl. ¶¶ 20, 22-26, Dkt. No. 1.)  As an MPC, Askew reports to the Director of Ministerial, Family, and Volunteer Services, Mark Leonard, a white Catholic deacon, and serves as the liaison between the Central Office of DOCS and the Protestant inmate and staff population statewide.  (*See id.* ¶¶ 14, 23, 35.)  Askew alleges that DOCS and her supervisors discriminated against her in various ways, including the manner they approved of meetings and training opportunities, assigned duties, and offered speaking appearances. (*See id.* ¶¶ 28-32.)  She further avers that Leonard, who was appointed by Deputy Commissioner of Program Services, John Nuttall, consistently discriminated against her in favor of the Catholic MPC regarding assignments, career advancement opportunities, and training, despite her superior qualifications and experience.  (*See id.* ¶¶ 10, 36-39.)  In addition,

_____

[3]  The allegations are drawn from Askew's Complaint and presented in a light most favorable to her.  (*See* Compl.)

Askew's white managers and co-workers allegedly referred to her as "Muller's Revenge," which Askew posits is derived from "Montezuma's Revenge." (*Id.* ¶ 31.)

Askew also claims that defendants retaliated against her after she complained about the discriminatory treatment. (*See id.* ¶ 33.) On June 13, 2003, Askew met with Leonard to object to discriminatory practices regarding her work assignments, training opportunities, travel reporting, and office staff support. (*See id.* ¶ 40.) During this meeting, Askew avers that Leonard told her that she "should never have gotten [the MPC] position because [she is] black and a woman." (*Id.*) After raising similar complaints to Leonard in April 2004, Askew was told to file a formal grievance. (*See id.* ¶ 42.) On May 5 and 28, 2004, Askew informally met with Leonard and Nuttall to raise the same issues of discrimination. (*See id.* ¶ 43.) According to Askew, she was accused of being a "conflict maker" at the meeting, and the discrimination continued "unabated" afterwards. (*Id.*)

Moreover, Askew alleges that DOCS and her supervisors discriminated against her in determining promotions and transfers. In March 2005, she applied for and was denied the position of Director of Volunteer Services, which was filled by a "less qualified" white woman. (*Id.*

¶ 45.)  Though the personnel office told her that she was unqualified because she was not a civil service employee, Askew asserts that the job posting did not mention any such requirements.  (*See id.*)  Furthermore, in February 2006, Nuttall appointed a white male former-Catholic priest to an administrative position in Harlem that Askew sought.  (*See id.* ¶¶ 46-47.)  Askew contends that in making this appointment DOCS deviated from its standard hiring practice.  (*See id.* ¶¶ 47-49.)  Finally, in September 2006, Omega Alston, an African-American woman, was appointed Assistant Director of Ministerial Services, a position which Askew repeatedly inquired about to Leonard but was told she was ineligible for.  (*See id.* ¶¶ 50-51.)  However, Askew asserts that she was eligible, and unlike Alston, qualified to fulfill all of the assigned duties.  (*See id.* ¶¶ 50-52.)  After her appointment, Alston supervised Askew and allegedly continued DOCS's discriminatory practices, which included telling others that she was hired "to clean house" and "get rid of" Askew.  (*See id.* ¶¶ 53-54.)

Shortly thereafter, DOCS allegedly began to reorganize the ministerial program by, among other things, mistakenly downgrading

Askew's salary[4] and shifting some of the MPCs' authority to Alston. (*See id.* ¶ 55.) Askew vocally opposed this downgrade—which she viewed "as a part of [a] continued effort by DOCS to dilute the role of the church in the life of inmates, and to place the chaplains under direct control of secular officials, in order to restrict religious freedom for chaplains and inmates"—at a meeting in November 2006. (*Id.* ¶¶ 56, 60.) Upon learning of her concerns, Leonard allegedly told Askew he was "going to . . . personally have [her] removed from [her] position." (*Id.* ¶ 60.)

Askew additionally asserts that DOCS and her supervisors retaliated against her for opposing discriminatory actions and for exercising her rights of freedom of religion and speech. Specifically, Askew contends that while male MPCs were allowed to choose and attend faith-related events, Alston refused to allow Askew to speak at or participate in Protestant faith and community activities around the state. (*See id.* ¶¶ 63-65, 69-70.) During this period, Askew's supervisors also began scrutinizing her travel vouchers. (*See id.* ¶ 66.) And in late November 2007, after being notified by the Finance Office that her September and October time records had

_____

[4] On November 28, 2006, Askew received a letter from the New York Department of Civil Service stating that her salary downgrade was "an administrative error." (Compl. ¶ 62.)

not been submitted, Askew was told that her confidential personnel file went missing.  (*See id.* ¶ 72.)  She later discovered the file on a chair in Leonard's office, which was unsecured and in plain view.  (*See id.* ¶ 73.)

On December 1, 2007, Askew filed a formal grievance against her supervisors based on, among other things, their purported (1) failures to submit her time records to the Finance Office, (2) refusal to meet with her over a six-month period, and (3) arbitrary and capricious determinations regarding her responsibilities.  (*See id.* ¶ 74.)  In addition, Askew filed a formal grievance against Leonard for failing to protect her confidential file and for engaging in a pattern of discriminatory conduct.  (*See id.* ¶ 75.) Askew also filed a grievance by mail to Kenneth Perlman, Deputy Commissioner for Program Services, seeking his review of the grievance proceedings.  (*See id.* ¶ 76.)

Supposedly in response to Askew's grievance, Leonard issued a formal counseling, which stated that Askew "'searched through [his] papers looking for documents.'"  (*Id.* ¶ 77.)  Askew then submitted a written letter accusing Leonard of discriminatory actions, noting that she feared additional reprisals, and requesting that the formal counseling be removed from her file and that her personnel records be returned to the Personnel

Department.  (*See id.*)  Following this episode, Askew filed another grievance against Leonard for violating the grievance procedures and for conducting proceedings for which he was the subject.  (*See id.* ¶¶ 78-82, 85.)

In January 2008, Askew met with Mary Bogan de Belmonte, Assistant Commissioner of Program Services, to review her grievances and to discuss her desire for structural and substantive changes in the department.  (*See id.* ¶ 86.)  De Belmonte issued a decision denying Askew's request to have Leonard's formal counseling removed from her file.  (*See id.* ¶ 87.)  Askew appealed this determination to Peter Brown, Director of Labor Relations, asserting that she was a target of discrimination and retaliation, and that since airing her grievances, she had been investigated by the Inspector General Office, divested of her travel privileges, and restricted to office hours.  (*See id.* ¶¶ 88-89.)  Askew also notified Brown that she feared reprisals from Leonard based on disparaging and threatening remarks he made to her.  (*See id.* ¶ 90.)

Leonard retaliated by initiating an investigation into Askew's time and expense records and her outside employment, which was conducted by Assistant Inspector General Mark Miller.  (*See id.* ¶¶ 91, 93.)  Based on

Miller's investigation, Brown issued a "Notice of Charges" against Askew in May 2008 for submitting false travel and time records, making false statements, attending an October 2007 workshop without approval, and arriving to work late and leaving early.  (*See id.* ¶¶ 70, 95.)

On March 19, 2008, Askew filed a verified complaint with the New York State Division of Human Rights (DHR) and the Equal Employment Opportunity Commission (EEOC) charging DOCS with sex, race, color, and creed discrimination and unlawful retaliation.  (*See* Compl. ¶ 97.)  On October 1, 2008, the DHR dismissed Askew's complaint as unsupported by the evidence.  (*See id.*)  The EEOC adopted those findings on February 11, 2009, and issued a right-to-sue letter.  (*See id.* ¶ 4.)  Two months later, Askew commenced this action.  (*See generally id.*)

## B.   <u>Defendants' Justification</u>[5]

_____

[5]  Askew's response to defendants' Rule 7.1(a)(3) statement contains several unsubstantiated denials.  (*See* Dkt. No. 81, Attach. 3); *see also* N.D.N.Y. L.R. 7.1(a)(3) (requiring that "[e]ach denial shall set forth a specific citation to the record where the factual issue arises").  Nevertheless, the court deems admitted those facts which are properly supported by admissible evidence pursuant to Federal Rule of Civil Procedure 56(e)(2) and Local Rule 7.1(a)(3).  By that same token, however, the court cannot "make credibility determinations."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  This is particularly relevant here because defendants' motion includes declarations from the individual defendants, in which each denies that race, religion, gender or retaliatory motive had any role in their respective decisions.  (*See, e.g.,* Dkt. No. 68, Attach. 4 ¶¶ 33, 34.)  Relying on these declarations, defendants asserted these denials as uncontested facts.  (*See, e.g.*, Dkt. No. 68, Attach. 11 ¶¶ 79-80.)  In turn, Askew denied each of these facts and submitted a response to defendants' affirmations.  (*See* Dkt. No. 81, Attachs. 2, 3.)  Given that defendants' motives are potentially dispositive and ultimately subject to evaluation by the trier of fact, the

On February 3, 2006, the Office of the State Comptroller reexamined DOCS's compliance with its 2002 report entitled "Chaplains Travel Review," which found "inadequate monitoring of travel expenses." (Dkt. No. 68, Attach. 3 at 210-14.) While "some progress" was noted, the Comptroller's office found that "questionable charges by DOCS chaplains" continued. (*Id.* at 211.) In response, Leonard, along with Bruce A. Johnson, the Director of Budget and Finance, authored a letter detailing the steps DOCS was taking to address the accounting issues, one of which was to hire an Assistant Director of Ministerial Services in Albany to provide closer supervision of chaplains' travel. (*See id.* at 207-09.) To this end, when she was hired in September 2006, Alston was informed "that a major focus of her job was to closely monitor the travel of Ministerial Services staff." (Defs.' Statement of Material Facts (SMF) ¶¶ 192, 206, Dkt. No. 68, Attach. 11.)

Just over one year later, Alston was reviewing travel vouchers when she noticed that Askew submitted documentation stating "that she visited a facility on Labor Day, September 3, 2007, which was a non-working

_____

court rejects these affirmative denials, but nonetheless "review[s] the record as a whole." *Reeves*, 530 U.S. at 151.

holiday." (*Id.* ¶ 208.)  Alston reported this to Leonard, who instructed her to contact the facility Askew claimed she visited, and determine whether she actually worked that day.  (*See id.* ¶ 209.)  Upon learning that Askew had not visited the facility, Alston "began calling other facilities to confirm the accuracy of" Askew's travel vouchers.  (*Id.* ¶ 210.)  In so doing, Alston discovered "several" additional discrepancies, and reported these findings to Leonard.  (*Id.* ¶ 211.)  In turn, Leonard "informed the DOCS Personnel Office and Office of Budget and Finance, who then performed their own investigation into [Askew's] travel vouchers."  (*Id.* ¶ 169.)  Following those reviews, the Personnel Office referred the matter to the Office of the Inspector General for a formal investigation.  (*See id.* ¶ 170.)

On December 13, 2007, Miller was assigned to investigate Askew's travel.  (*See id.* ¶¶ 214-15.)  The investigation was focused on the period of January to December 2007, and included the review of emails, time cards, travel calendars and vouchers, hotel and rental car receipts, and Askew's reported travel.  (*See id.* ¶ 219.)  In addition, Miller went to each of the facilities Askew reported visiting and obtained the log books; he also "subpoenaed EZ Pass records," and conducted interviews with Leonard and Askew.  (*See id.* ¶¶ 171, 220, 241.)  In sum, Miller found that Askew

had a number of discrepancies in her travel records, including thirty-three occasions where she "reported arriving at facilities more than twenty minutes earlier than documented in the logbooks," and forty-seven times where she left the facility twenty minutes earlier than she documented on her time sheet. (*Id.* ¶¶ 225-37.) Though he did not have the authority to bring disciplinary charges, Miller's April 3, 2008 report "recommended that the case be forwarded to DOCS Department of Labor Relations for possible disciplinary charges." (*Id.* ¶ 244; Dkt. No. 68, Attach. 8 at 37-39.) A Notice of Discipline followed on May 9, 2008. (*See* Defs.' SMF ¶¶ 53-54; Dkt. No. 68, Attach. 3 at 225-29.)

## C. **Post-Commencement Events**

Following his investigation into Askew's travel, Miller was assigned to review Askew's conduct in relation to the 2009 Protestant conference. (*See* Defs.' SMF ¶¶ 245, 248.) In preparation for that conference, Askew submitted a proposal to Leonard seeking funding from DOCS for lodging, food, facilities and fees for three speakers. (*See id.* ¶ 180.) Leonard approved all but the fees for the speakers, informed Askew of his decision, and approved a conference announcement to that effect. (*See id.* ¶¶ 181-82.) Thereafter, Leonard learned that the chaplains were being charged an

unauthorized registration fee for the conference.  (*See id.* ¶ 183.)

During the course of his investigation Miller uncovered correspondences between Askew and potential speakers that discussed "compensation for travel, lodging and speaking fees," as well as registration materials that she sent "to DOCS chaplains which directed that the chaplains needed to pay a $90 registration fee, payable to the Council of Churches, to attend the mandatory conference."  (*Id.* ¶¶ 249-50.)  Miller also found that Askew improperly attempted to have another DOCS administrator pay expenses that Leonard already denied.  (*See id.* ¶¶ 261, 263-64.)  Finally, during the course of this investigation, Miller "discovered that [Askew] had corresponded with a former inmate and a former parolee in violation of DOCS rules."  (*Id.* ¶ 279.)   As he did before, Miller filed a report with his findings in August 2009, again recommending that DOCS Department of Labor Relations pursue disciplinary charges.  (*See id.* ¶¶ 281-82; Dkt. No. 68, Attach. 8 at 47-50.)  A second Notice of Charges followed on September 1, 2009.  (*See* Dkt. No. 68, Attach. 3 at 273-74.)

Although the disposition of the first Notice of Discipline is unclear, the second Notice resulted in a civil service hearing.  (*See id.* at 276-304.) After hearing multiple days of testimony, reviewing the evidence, and

considering post-hearing briefs, Hearing Officer Joel M. Douglas recommended that Askew be dismissed from service. (*See id.* at 304; Dkt. No. 72, Attach. 1 at 35-61; Dkt. No. 72, Attach. 2 at 30-44.) On the basis of Douglas' findings and recommendations, Askew's employment was terminated on June 19, 2010. (*See* Dkt. No. 72, Attach. 1 at 2.) Her subsequent state court challenge was dismissed on procedural grounds. (*See* Dkt. No. 68, Attach. 3 at 348-52.)

### III.  Standard of Review

The standard of review under Federal Rule of Civil Procedure 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011).

### IV.  Discussion

Defendants argue that they are entitled to summary judgment on all of Askew's claims because some are untimely or unexhausted, and the remainder fail as a matter of law. (*See generally* Dkt. No. 68, Attach. 12.) In response, Askew seeks judgment on the pleadings, denial of defendants' motion, or, in the alternative, permission to amend her Complaint to include allegations relating to the events that transpired after

she commenced this action.  (*See generally* Dkt. Nos. 72, 76, 81, 83, 84.)

Before addressing the merits of Askew's claims, the court first determines

what allegations are properly before it, and then, whether summary

judgment is appropriate.

**A.     Scope of the Instant Case**

Defendants initially argue that Askew's Complaint includes alleged

violations of Title VII that predate the filing of her DHR claim by more than

300 days, and/or were not included in the administrative complaint.  (*See*

Dkt. No. 68, Attach. 12 at 4-8.)  They further assert that any allegations

against the individual defendants that occurred prior to May 11, 2006 are

also untimely.  (*See id.* at 9-10.)  Askew counters that defendants' conduct

constituted a "continuing violation," and all of her claims are "reasonably

related" to her DHR complaint.  (*See* Dkt. No. 81, Attach. 1 at 10-12, 15-

16.)  In addition to denying defendants' motion on these grounds, Askew

requests permission to amend her Complaint to include claims, and

defendants, relating to the second investigation that resulted in her

dismissal from service.  (*See generally* Dkt. No. 84.)  The court will address

each of these arguments in turn.

*1. Timeliness Under Title VII*

Before commencing an action in federal court, a plaintiff "must file timely administrative charges." *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 213 (2d Cir. 2006). If the plaintiff has instituted proceedings with an appropriate state agency, she "has 300 days from the occurrence of an adverse employment action to file charges with the EEOC." *Id.* (citing 42 U.S.C. § 2000e-5(e)(1)). This timeliness requirement operates "analogous to a statute of limitations." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996). Accordingly, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

An exception to the general rule exists where the "discriminatory acts [are] committed under [an ongoing policy of discrimination]," *Annis v. Cnty. of Westchester*, 136 F.3d 239, 246 (2d Cir. 1998) (internal quotation marks and citation omitted), or "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice," *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994). This so-called continuing violation doctrine, which is "disfavored" in the Second Circuit, applies under only "the most compelling circumstances." *Petrosky v. N.Y. State Dep't of*

*Motor Vehicles*, 72 F. Supp. 2d 39, 48 (N.D.N.Y. 1999) (internal quotation

marks and citations omitted).  Absent evidence of a discriminatory *policy* or

*mechanism*, such as a seniority list or employment test, "multiple incidents

of discrimination, even similar ones," will not be deemed a continuing

violation.  *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993),

*abrogated on other grounds by Kasten v. Saint-Gobain Performance

Plastics Corp.*, 131 S. Ct. 1325 (2011).  Thus, the continuing violation

doctrine cannot be used to "preserve time-barred discrete discriminatory

acts."  *Delrio v. Univ. of Conn. Health Care*, 292 F. Supp. 2d 412, 420 (D.

Conn. 2003).

Certain discrete acts—*e.g.*, "termination, failure to promote, denial of

transfer, or refusal to hire"—are readily identifiable.  *Morgan*, 536 U.S. at

114.   Additionally, it is well settled in this Circuit that "discriminatory

transfers, job assignments and non promotions, and failure to compensate

adequately" are also "discrete acts."  *Delrio*, 292 F. Supp. 2d at 420

(collecting cases); *see Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907

(2d Cir. 1997) (stating that discontinuing "a particular job assignment" is not

an act "of a continuing nature").  Overall, the guiding principle is that "[e]ach

incident of discrimination and each retaliatory adverse employment

decision constitutes a separate actionable unlawful employment practice."
*Delrio*, 292 F. Supp. 2d at 420 (internal quotation marks and citation omitted).

Here, Askew filed her complaint with the DHR on March 19, 2008, (*see* Dkt. No. 68, Attach. 3 at 164-70); thus, all of the alleged discriminatory or retaliatory acts that occurred before May 24, 2007 are untimely. (*See* Dkt. No. 68, Attach. 12 at 4-6); 42 U.S.C. § 2000e-5(e)(1). As a result, the only potentially actionable claims are: (1) the misconduct charge for attending the Binghamton conference, (*see* Compl. ¶ 70); (2) Alston's refusal to abide by the outcome of the meeting in October 2007, and Medina's failure to "ensure her compliance," (*id.* ¶ 71); (3) the issues surrounding the unsubmitted travel vouchers in September and October 2007, (*see id.* ¶¶ 72-73); (4) the formal counseling Leonard issued on December 12, 2007 "[i]n retaliation" for the grievances Askew filed, (*id.* ¶ 77); (5) Leonard's handling of, and Alston's response to, Askew's grievances, (*see id.* ¶¶ 78-84); (6) de Belmonte's[6] review and denial of the grievances, (*see id.* ¶¶ 85-87); (7) Askew's grievance to Brown in January

---

[6] Defendants argument regarding de Belmonte's passing and Askew's failure to name her estate is unpersuasive. (*See* Dkt. No. 68, Attach. 12 at 12-13.) To date, defendants have not filed the requisite formal suggestion of death. *See* Fed. R. Civ. P. 25(a)(1); *see, e.g.*, *Grandbouche v. Lovell*, 913 F.2d 835, 836-37 (10th Cir. 1990).

2008, wherein she asserted, among other things, that "she was the target of discrimination and retaliation," (*id.* ¶ 88); (8) Leonard's retaliatory initiation of the investigation into Askew's travel, (*see id.* ¶ 91); (9) Miller's conduct during that investigation, (*see id.* ¶¶ 93-94); and (10) Brown's issuance of the Notice of Charges in May 2008, (*see id.* ¶ 95). (*See* Dkt. No. 68, Attach. 12 at 6.) Though the remaining allegations cannot form the basis of a Title VII claim, they are, to the extent that Askew can substantiate them, still relevant "as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113.

Recognizing that many of her claims occurred outside of the 300-day window, Askew argues that all of events discussed in the Complaint constitute a continuos violation. (*See* Dkt. No. 81, Attach. 1 at 12-14.) Besides the fact that the failure to promote, denial of a transfer, or discontinuance of a particular job responsibility are clearly discrete, *see Morgan*, 536 U.S. at 114; *Delrio*, 292 F. Supp. 2d at 420; *Lightfoot*, 110 F.3d at 907, Askew's argument is flawed for two key reasons. First, the case law that Askew relies on is relevant in analyzing a hostile work environment claim, not a discrimination or retaliation claim. (*See* Dkt. No. 81, Attach. 1 at 14.) As discussed below, the Complaint does not allege a

cause of action for hostile work environment.  (*See* Compl. at 25-30.)  And, most importantly, second, Askew has not proven that a policy or mechanism of discrimination existed.  *See Lambert*, 10 F.3d at 53.  As the Circuit explained in *Lightfoot*, 110 F.3d at 907: "[a]lthough the mere allegation of the existence of such a policy would be sufficient to withstand a challenge for failure to state a claim, something more is required to avoid summary judgment on the issue."  With the exception of Askew's arguments and conclusory allegations to the contrary, there is simply no evidence that defendants had the requisite policy or mechanism to warrant application of the continuing violation doctrine.  *See Lambert*, 10 F.3d at 53.  As such, Askew's causes of action under Title VII that are based on events predating the filing of the DHR claim by more than 300 days are dismissed.

### 2.  *Exhaustion*

Title VII limits a district court's review to "claims that are either included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is reasonably related to that alleged in the EEOC charge."  *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993) (internal quotation marks and citation omitted),

*superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071.  Exhaustion is essential because it "give[s] the administrative agency the opportunity to investigate, mediate, and take remedial action."  *Stewart v. U.S. Immigration & Naturalization Serv.*, 762 F.2d 193, 198 (2d Cir. 1984).  Claims not included in an EEOC charge may still be asserted in a subsequent suit if the claims are "sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action."  *Butts*, 990 F.2d at 1402.  This exception applies where "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) (quotation marks and citation omitted).

In the instant case, defendants argue that "discrete acts" are alleged in the Complaint, but they were not included in the DHR claim.  (Dkt. No. 68, Attach. 12 at 7-8.)  In short, the court, for the reasons articulated in its previous Memorandum-Decision and Order, remains unconvinced that Askew failed to exhaust administrative remedies with respect to the timely events preceding the DHR complaint.  (*See* Dkt. No. 11 at 17-18.)  The same is not true of the allegedly discriminatory conduct that occurred after

the Complaint was filed.

Although neither party directly addresses this issue, both, in various portions of their respective submissions, discuss events—specifically the second investigation into the 2009 Protestant conference and Askew's eventual termination—that transpired after the commencement of this case. (*See, e.g.*, Defs.' SMF ¶¶ 245-82; Dkt. No. 81, Attach. 1 at 8-9.)  Given that Askew did not submit her proposal for the conference until January 27, 2009, and the misconduct occurred after final approval was given on March 23, 2009, (*see* Dkt. No. 68, Attach. 8 at 47-50), it was not possible for the DHR, which issued its decision on October 1, 2008, to have considered them, (*see* Dkt. No. 68, Attach. 3 at 251-53).  And even if the EEOC had conducted an independent investigation, which it did not, it issued the right-to-sue letter in February 2009, over one month before the conference was approved.  (*See* Dkt. No. 72, Attach. 1 at 81).  Thus, this chronology demonstrates that Askew's claims surrounding the second investigation were not exhausted, and furthermore, that the conduct complained of did not "fall within the scope of the EEOC investigation."  *Terry*, 336 F.3d at 151 (internal quotation marks and citation omitted).  While exhaustion is not a jurisdictional requirement, it is nonetheless an essential element of a Title

VII claim, *see Francis v. City of N.Y.*, 235 F.3d 763, 767-68 (2d Cir. 2000), and a significant consideration in determining whether Askew should be permitted to amend her Complaint to include these allegations.

    *3. Statute of Limitations Under Sections 1981 and 1983*

    In New York, claims under 42 U.S.C. § 1983 are subject to the general or residual statute of limitations for personal injury actions, *i.e.*, three years from the date of injury. *See Owens v. Okure*, 488 U.S. 235, 251 (1989); N.Y. C.P.L.R. § 214(5) (McKinney 1997). Causes of action under section 1981 are governed by a four-year statute of limitations. *See Lawson v. Rochester City Sch. Dist.*, 446 F. App'x 327, 328 (2d Cir. 2011). Because the Complaint was filed on May 11, 2009, any alleged misconduct under section 1983 that occurred prior to May 11, 2006, and May 11, 2005 for the section 1981 claim, is untimely. (*See* Compl.; Dkt. No. 68, Attach. 12 at 9-10.) Such time barred allegations include: Askew being called "Muller's Revenge"[7] and being "forced"[8] to relocate to Albany, (Compl. ¶¶

---

    [7] Askew clarified that she was called "Muller's Revenge" during her first two years as an MPC, which were 2001 and 2002. (*See* Dkt. No. 68, Attach. 3 at 65; Compl. ¶ 5.)

    [8] Notably, Askew admitted during her deposition that this allegation was not entirely true. (*See* Dkt. No. 68, Attach. 3 at 37.)

30-31); Leonard's discriminatory remark on June 13, 2003,[9] (*see id.* ¶ 40); and the reference to Askew as a "conflict maker" during two meetings with Nuttall and Leonard in May 2004, (*id.* ¶ 43).  Though Askew asserts that these claims are also saved by the continuing violation doctrine, (*see* Dkt. No. 81, Attach. 1 at 15-16), the court, for the reasons discussed above, disagrees.  *See Corona Realty Holding, LLC v. Town of N. Hempstead*, 382 F. App'x 70, 72 (2d Cir. 2010) (discussing the continuing violation doctrine in a case brought under section 1983).  Accordingly, Askew's claims are dismissed to the extent that they relate to events occurring before May 11, 2006 for the purposes of section 1983, and May 11, 2005 for section 1981.

### 4.  Askew's Motion to Amend

The final prefatory issue is whether Askew should be permitted to amend her Complaint to include the post-commencement events.  (*See* Dkt. No. 84.)  Specifically, Askew seeks to name six additional defendants and over seventy new paragraphs of allegations that address the

---

[9] Though her Complaint alleges that Leonard said "You should have never gotten this position because you are black and a woman," Askew later stated at her deposition that Leonard actually qualified his statement with "some say."  (*Compare* Compl. ¶ 40, *with* Dkt. No. 68, Attach. 3 at 62.)  When asked to clarify which version was accurate, Askew responded they were the same to her.  (*See* Dkt. No. 68, Attach. 3 at 62.)

investigation into the Protestant conference, the second Notice of
Discipline and her termination from DOCS.  (*See id.* at 5-18.)  Defendants
oppose Askew's motion.  (*See* Dkt. No. 85.)  The court agrees with
defendants.

Federal Rule of Civil Procedure 15(a) provides that where a party
seeks to amend her pleading before trial, "[t]he court should freely give
leave when justice so requires."  "A motion to amend should be denied only
for such reasons as undue delay, bad faith, futility of the amendment, and
perhaps most important, the resulting prejudice to the opposing party."
*Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir.
1987) (internal quotation marks and citation omitted).  "An amendment to a
pleading will be futile if a proposed claim could not withstand a motion to
dismiss pursuant to Rule 12(b)(6)."  *Dougherty v. Town of N. Hempstead
Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).   It would be
prejudicial if, for example, the amendment "'would delay the final
disposition of the action.'"  *Krumme v. WestPoint Stevens Inc.*, 143 F.3d
71, 88 (2d Cir. 1998) (quoting *H.L. Hayden Co. v. Siemens Med. Sys.*, 112
F.R.D. 417, 419 (S.D.N.Y. 1986)).  Where leave to amend is sought after
discovery is completed and the "non-movant ha[s] already filed a motion for

summary judgment," the proposed amendment is "especially prejudicial." *Krumme*, 143 F.3d at 88 (internal quotation marks, citations and alterations omitted).

In this case, Askew's proposed amendment is both futile and prejudicial. First, there is no evidence that she filed a second DHR or EEOC complaint that addressed the post-commencement events. These claims are therefore untenable because they are now untimely and unexhausted. *See* 42 U.S.C. § 2000e-5(e)(1); *Francis*, 235 F.3d at 767-68. Furthermore, allowing an amendment at this juncture would be "especially prejudicial" as discovery closed in July 2012, (*see* Dkt. No. 63), the dispositive motion deadline passed and defendants' motion for summary judgment was pending when Askew filed her request to amend, (*see* Dkt. Nos. 68, 84). *Krumme*, 143 F.3d at 88. Finally, Askew was notified by defendants' counsel at her deposition in August 2011—over one year after she was terminated—that her Complaint was never amended. (*See* Dkt. No. 68, Attach. 3 at 32-36; Dkt. No. 72, Attach. 1 at 2.) While Askew's *pro se* status entitles her to a certain degree of leniency, it cannot excuse her failure to timely amend her Complaint to include the post-commencement events.

By this same token, Askew cannot add new theories of liability either. Specifically, Askew uses the terms "hostile work environment" and "disparate and adverse impact" throughout her submissions in describing how defendants violated her rights. (*See, e.g.*, Dkt. No. 81, Attach. 1 at 10.) However, these theories were not included in the Complaint. (*See* Compl. ¶¶ 103-43); Fed. R. Civ. P. 8(a); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (stating that under Rule 8, "the defendant [must be given] fair notice of what the . . . claim is and the grounds upon which it rests" (internal quotation marks and citation omitted)). As such, neither they, nor the new allegations discussed above, can be added at this juncture. It follows that Askew's motion for leave to amend is denied.

## B.  Discrimination and Retaliation Claims

The crux of defendants' arguments on the merits is that Askew has neither established a prima facie case of discrimination or retaliation, nor adduced sufficient evidence to survive summary judgment. (*See* Dkt. No. 68, Attach. 12 at 8-9.) Conversely, Askew avers that she is not only entitled to judgment on the pleadings, but also, or alternatively, that defendants' motion for summary judgment should be denied. (*See* Dkt.

No. 72; Dkt. No. 81, Attach. 1 at 27.)  In short, Askew's assertions are meritless.

    *1.  Title VII, 42 U.S.C. §§ 1981 and 1983 Discrimination Claims*

    Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). Discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting rules, which places upon the plaintiff the initial burden of making out a prima facie case of discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)*; White v. Eastman Kodak Co.*, 368 F. App'x 200, 201 n.1 (2d Cir. 2010) (noting that the Title VII discrimination framework is applicable to claims under 42 U.S.C. § 1981); *Feingold v. New York*, 366 F.3d 138, 159 & n.20 (2d Cir. 2004) (applying the Title VII burden-shifting analysis to a discrimination claim under section 1983 and stating "the two must stand or fall together").  To satisfy this initial burden, the plaintiff "'must show: (1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse

employment action; and (4) that the adverse employment action occurred

under circumstances giving rise to an inference of discriminatory intent.'"

*Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting

*Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)).

Here, Askew has failed to satisfy, at minimum,[10] the third and fourth

prongs of her prima facie case.  An adverse employment action occurs

when the plaintiff "endures a materially adverse change in the terms and

conditions of employment."  *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir.

2006) (internal quotation marks and citation omitted).  Such changes

include termination, "a demotion evidenced by a decrease in wage or

salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices unique to a particular

situation."  *Terry*, 336 F.3d at 138 (internal quotation marks and citations

omitted).  Although her travel privileges were restricted in late 2007, and

she was supposedly denied certain administrative and ceremonial duties,

---

[10] Arguably, Askew cannot satisfy the second prong either given the misconduct charges against her.  "Although misconduct indicates a high likelihood that an employee's performance is not satisfactory . . . it is at least theoretically possible that an employee committed some misconduct and yet, in the aggregate, performed satisfactorily."  *Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29-30 (2d Cir. 1997).  However, because the record is unclear in regard to the disposition of the first set of charges, the court will not address this prong.

the court is unable to discern any changes in Askew's employment status that were "more disruptive than a mere inconvenience or an alteration of job responsibilities."[11]  *Id.* (internal quotation marks and citations omitted). Indeed, her eventual termination—the only actual adverse employment action—is outside the scope of this case.  (*See* Dkt. No. 68, Attach. 3 at 276-304.)

But even if the Complaint alleged an adverse employment action, there is still no evidence that such act "occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown*, 673 F.3d at 150 (internal quotation marks and citation omitted).  This is so because the record is wholly devoid of any evidence of discrimination.  It is, however, replete with conclusory allegations, conjecture, speculation and inadmissible evidence,[12] all of which are insufficient to defeat summary

---

[11]  Notably, Askew submitted a copy of a letter indicating that she was placed on Administrative Leave for one week in May 2009.  (*See* Dkt. No. 72, Attach. 4 at 4.)  Albeit unclear what precipitated that leave, and whether the underlying conduct is properly within the scope of this case, placement on administrative leave is not an adverse employment action. *See Joseph*, 465 F.3d at 91 (stating that "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner").

[12]  Though the court reviewed the evidence Askew submitted in support of her claim liberally, without a hyper-technical focus on the rules of evidence, it is nonetheless unpersuaded that the affidavit of Courtney Muhammad, which discusses his interactions with Nuttall on behalf of the Nation of Islam, has any relevance in this case.  (*See* Dkt. No. 72, Attach. 6 at 4-86.)  Among other deficiencies, Muhammad addresses events well outside the actionable time period.  (*See id.*)

judgment.  *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  For example, in what appears to be a recap of her meeting with de Belmonte on January 16, 2008, Askew states that she was "struggling to convey" the discriminatory, disrespectful and dismissive behavior.  (Dkt. No. 72, Attach. 4 at 34-35.)  Similarly, her grievance appeal to Brown dated January 23, 2008 repeatedly uses the word "discrimination," and vaguely references how she is being mistreated. (*See id.* at 36-38.)  The same is true of the summary of the "incident" on August 27, 2008, (*see* Dkt. No. 72, Attach. 1 at 90); Demi McGuire's quote in the September 21, 2009 Times Union article, (*see* Dkt. No. 72, Attach. 2 at 14-15); her December 1, 2007 grievance, (*see* Dkt. No. 72, Attach. 4 at 46-47); her rebuttal to the formal counseling, (*see id.* at 49); the December 14, 2007 grievance, (*see id.* at 52-53); the letter from the New York State Association of Protestant Chaplains, (*see* Dkt. No. 72, Attach. 5 at 46-47); and the declaration of Edwin Muller, (*see* Dkt. No. 72, Attach. 6 at 2). Besides not entirely supporting her contentions regarding her work environment, not one of these documents contain evidence, direct or circumstantial, of a specific incident of discrimination where the alleged discriminatory conduct, assuming there was any, had any connection with

Askew's protected characteristics.

Presumably, Askew's discussion of how she was treated in comparison to other MPCs was intended to create the discriminatory inference.  *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010.)  "A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside [her] protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case."  *Id.* (internal quotation marks and citation omitted).  To be "similarly situated," the employees must be "(1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'"  *Id.* at 493-94 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir.2000)).  While the plaintiff and comparator's cases need not be identical, there must be "a reasonably close resemblance of the facts and circumstances of [the] cases."  *Id.* at 494.  Stated another way, "the comparator must be similarly situated to the plaintiff in all material respects."  *Id.* (internal quotation marks and citation omitted).

In the instant case, Askew claims that she was treated differently than MPC Thomas Sharrow, a white male Catholic deacon, insofar as

32

Leonard favored Sharrow and gave him additional opportunities to do central office reviews, emergency contact calls, death notification calls and sergeant training courses.[13]  (*See* Compl. ¶¶ 36, 38.)  She also asserts that Leonard denied her "training opportunities" and Alston would not approve her attendance at various events.[14]  (*Id.* ¶¶ 39, 63-65.)  What is absent from these allegations are the necessary particulars to establish that Askew and Sharrow, or for that matter, the other "male MPCs," were appropriate comparators.[15]  (*Id.* ¶ 39); *see Sanguinetti v. United Parcel Serv., Inc.*, 114 F. Supp. 2d 1313, 1317 (S.D. Fla. 2000) (stating that to be similarly situated, the comparators must have, *inter alia*, "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it").

Nevertheless, Askew's argument on disparate treatment is misguided.  Rather than attempting to show disparities in discipline or

---

[13]  Notably, these allegations are likely untimely as Askew had a meeting to remedy the alleged discriminatory conduct in June 2003.  (*See* Compl. ¶ 40.)  Nevertheless, they are illustrative of the underlying deficiency in her claims.

[14]  Askew's deposition casts doubt on whether she was actually outright denied or simply had less chances to perform certain tasks after Leonard was hired.  (*See* Dkt. No. 68, Attach. 3 at 49-50.)

[15]  Notably, DOCS's response to Askew's administrative complaint states "[t]here was no other [MPC] charged for the same or similar conduct that Ms. Askew engaged in for the period of 2003 to [2008]."  (Dkt. No. 68, Attach. 3 at 172-73.)

evaluations, Askew is focused on *de minimus* assignments that had no bearing on her employment status. There is no evidence, for example, that Sharrow received any change in his employment as a result of performing central office reviews, emergency contact calls, death notification calls and sergeant training courses, or that Askew was deprived of the same because she did not complete them.[16] In fact, Askew stated that the extra assignments were not part of her "primary" job responsibilities. (Dkt. No. 68, Attach. 3 at 39.) And her 2008 performance appraisal, which articulates all of the duties of an MPC, makes no mention of them. (*See id.* at 255-60.) On the basis of the record before it, the court is unpersuaded that the additional duties that Askew was allegedly not permitted to complete had any bearing on her employment status.[17] Her disparate treatment claims, therefore, have no probative value in determining whether there was "an adverse employment action [that] occurred under

_____

[16] One of the disparities that Askew cites is that Sharrow was permitted to attend training opportunities while she was not. (*See* Compl. ¶ 39.) Besides the fact that there is no evidence that race, sex, or religion played a role in the decisions, which were decided on a discretionary basis with a focus on the benefit to DOCS, (*see* Dkt. No. 68, Attach. 4 ¶¶ 9, 11), Askew and Sharrow's requests are, on at least one occasion in October 2007, quite different. Unlike Sharrow, who sought preapproval and requested only two days off, Askew sought reimbursement for $270 in charges over one month after the conference. (*See* Dkt. No. 72, Attach. 5 at 35-36.)

[17] Conceivably, such mistreatment could be relevant in a hostile work environment case, which entails a much broader inquiry into the conditions of employment. *See Morgan*, 536 U.S. at 115-17 (discussing the inquiry required in a hostile work environment case).

circumstances giving rise to an inference of discriminatory intent." *Brown*, 673 F.3d at 150.

Likewise, the assertions Askew makes about her various interactions with Leonard and Alston are, standing alone, insufficient to establish a discriminatory animus. (*See, e.g.*, Dkt. No. 81, Attach. 1 at 6.) Simply put, "Title VII is not a general civility code." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999) (internal quotation marks and citation omitted). As the Second Circuit explained in *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 102 (2d Cir. 2001):

> [M]istreatment by defendants is not irrelevant in assessing the strength of plaintiff['s] circumstantial evidence of [discriminatory] animus, [yet] it is certainly not sufficient to establish it. [There are] many circumstances where markedly hostile treatment . . . would raise no inference of racial animus, but rather it would simply be yet another example of the decline of civility.

Though Askew believes all of defendants' actions were motivated by a discriminatory animus, she has not identified "any concrete particulars" that support such a conclusion. *Bickerstaff*, 196 F.3d at 452. It follows that because Askew has not proven her prima facie case, her causes of action for discrimination are untenable. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

35

Even if Askew's claims were not facially deficient, they would nonetheless fail under the final step of the *McDonnell Douglas* framework. To explain, by establishing her prima facie case, Askew creates "a presumption of unlawful discrimination," and "shifts the burden of production to [] defendant[s], who must [then] proffer a legitimate, nondiscriminatory reason for the challenged employment action." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (internal quotation marks and citations omitted). If defendants do so, the burden shifts back to Askew to show, by a preponderance of the evidence and without the benefit of the presumption, that "the legitimate reasons offered by [them] were not [their] true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). This showing may be made "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256.

Assuming *arguendo* that the investigation into her travel constituted the requisite adverse employment action, defendants have offered a legitimate justification for commencing the investigation—namely the

discrepancies in Askew's travel vouchers Alston discovered. (Defs.' SMF ¶¶ 208-09.) In order to survive summary judgment then, Askew would need to produce "sufficient evidence to support a rational finding that the . . . reasons proffered by the defendant [for reviewing her travel] were false, and that more likely than not discrimination was the real reason for" doing so. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). Given that the record is devoid of such evidence, it is impossible for Askew to make this showing.

No matter what allegations, timely or otherwise, the court considers, the result is the same. By example, if the court looked to the three positions Askew applied for but ultimately did not get, Askew, in order to undermine the credibility of defendants' stated reason for selecting another candidate, would need show that her credentials were "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over [her] for the job in question." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (internal quotation marks and citations omitted). However, Askew cannot meet this burden because she admitted that she was unqualified for two of the positions, and

acknowledged that there were legitimate reasons why she was not selected for the third. (*See* Dkt. No. 68, Attach. 3 at 28-30, 53-57; Dkt. No. 68, Attach. 9 ¶¶ 12-14; Dkt. No. 81, Attach. 14 at 5.) Askew's claims regarding the impropriety of Miller's investigation or lack of progressive discipline are equally unavailing. (*See, e.g.*, Dkt. No. 72 at 14-15, 33.) In a Title VII case, the question "is not whether defendants' decision to terminate plaintiff was correct but whether it was discriminatory."[18] *Robinson v. Zurich N. Am. Ins. Co.*, No. 10-cv-3926, 2012 WL 4320645, at *18 (E.D.N.Y. Sept. 21, 2012) (collecting cases); *see also Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). The same is true of all of Askew's actionable assertions.

Perhaps aware that she cannot establish pretext, Askew argues that this is a "mix motive" case. (*See, e.g.*, Dkt. No. 83 at 10-11.) The court disagrees. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989)

---

[18] Even if the civil service proceeding that led to her termination was within the purview of this case, the alleged improprieties therein would be immaterial. (*See* Dkt. No. 81, Attach. 1 at 21-25); *See Robinson*, 2012 WL 4320645, at *18. Relatedly, the fact that Askew disagrees with defendants' evaluation of her performance is also not evidence of pretext. *See id.*

(discussing the test in a mix motive case). "Evidence potentially warranting a *Price Waterhouse* burden shift includes, *inter alia*, policy documents and evidence of statements or actions by decisionmakers that may be viewed as *directly reflecting* the alleged discriminatory attitude." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173-74 (2d Cir. 2006) (internal quotation marks and citation omitted). Put simply, there is no such evidence here, and certainly not a "smoking gun" or "thick cloud of smoke" that is needed to trigger the mix motive analysis. *Id.* at 174 (internal quotation marks and citation omitted).

In sum, while the court is "required to resolve all ambiguities and draw all permissible factual inferences in" her favor, *Terry*, 336 F.3d at 137, Askew—as the nonmoving party with the burden of proof at trial—still must "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). Neither "conclusory statements, conjecture, [n]or speculation" will defeat a properly substantiated motion, such as defendants here. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Having reviewed the record as a whole, the court concludes that Askew has—despite being allowed to file multiple

submissions, some of which contain potentially inadmissible evidence, (*see* Dkt. Nos. 72, 76, 81, 83, 84)—failed to meet this burden.  Accordingly, her causes of action for discrimination under Title VII, and 42 U.S.C. §§ 1981 and 1983 are dismissed.

2.  *Title VII Retaliation*

Askew's retaliation claim fails for many of the same reasons discussed above.  "To establish a prima facie case of retaliation, an employee must show that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).  An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 609 (2d Cir. 2006). (internal quotation marks and citation omitted).  Because no such change occurred here, Askew's cause of action is untenable.  (*See supra* Part IV.B.1.)

But even if Askew did suffer an adverse action, there are several other flaws in her claim.  To be clear, the principal alleged retaliatory acts

here were the formal counseling Askew received from Leonard in December 2007 and the initiation of the investigation into her travel, which Askew suggests occurred sometime after she filed her January 2008 grievance. (*See* Compl. ¶¶ 77, 91.) Both of these acts, Askew avers, followed after she filed multiple grievances against Leonard and Alston. (*See id.* ¶¶ 74-91.) The problem with her theory, however, is that the investigation into her travel began in September 2007.[19] (*See* Defs.' SMF ¶¶ 208-11.) In fact, the matter was formally referred to the Inspector General's Office on November 29, 2007, three days before Askew filed her first grievance. (*See* Dkt. No. 68, Attach. 8 at 37; Compl. ¶ 74.) Thus, the investigation could not have been retaliatory. Moreover, the evidence does not support Askew's charge that Leonard's formal counseling was issued in retaliation for her filing a grievance. Instead, the counseling memorandum was only concerned with Askew's unauthorized entry into Leonard's office, which she admitted to doing *in her grievance*, as well as in a string of emails. (*See* Dkt. No. 68, Attach. 3 at 308, 312-14, 316-17.)

---

[19] Notwithstanding Askew's refusal to concede this point, she acknowledges that she received a notification that her timesheets for September and October had not been submitted on November 29, 2007, which led to her filing the grievance on December 1, 2007. (*See* Compl. ¶¶ 72, 73.) Furthermore, she admits that she was under investigation in a letter to Medina on November 2, 2007. (*See* Dkt. No. 72, Attach. 4 at 41.)

In addition to being unsupported by the facts, Askew's retaliation claims are also legally deficient. First, Askew has not "adduce[d] evidence that the adverse actions were in response to protected activity, which here refers to action taken to protest or oppose statutorily prohibited discrimination." *Benn v. City of N.Y.*, 482 F. App'x 637, 638 (2d. Cir. 2012) (internal quotation marks and citation omitted). This is so because Askew's grievances were ambiguous inasmuch as they did not make defendants aware of the alleged discriminatory misconduct. *See id.* A review of them evinces one of two things: either Askew uses a variation of the word "discrimination" without providing support for the charge,[20] or she grieves about matters unrelated to unlawful employment practices. (*See* Dkt. No. 68, Attach. 3 at 316-17, 319-20; Dkt. No. 72, Attach. 4 at 33-35, 39); *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (stating that "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or

---

[20] For example, in her appeal to Brown in January 2008, Askew states that she was discriminated against by Leonard because he did not counsel another employee "for a more egregious offense." (Dkt. No. 68, Attach. 3 at 329.) Albeit clear that she is alleging disparate treatment, Askew makes no mention of her protected characteristics. (*See id.*) Given this ambiguity, the court is unconvinced that this grievance was a protected activity as there is no evidence that demonstrates that Brown was aware that Askew was complaining of an unlawful employment practice. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

could reasonably have understood, that the plaintiff's opposition was directed at conduct *prohibited by Title VII*") (emphasis added)).  Indeed, the only unquestionably protected activity occurred on March 19, 2008 when Askew filed her DHR complaint, after which there are no actionable allegations of misconduct.[21]  (*See* Compl. ¶ 97.)

Though the court concludes that Askew has not established a prima facie case of retaliation, the result is again the same even if she had.  As was the case with her discrimination claims, proof of a prima facie case simply shifts the burden to defendants to put forth a legitimate, non-discriminatory reason for the adverse action.  *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 (2d Cir. 2011).  Clearly, defendants here have done so, as investigating Askew's travel discrepancies and ensuring compliance with workplace rules are such reasons.  (*See supra* Part IV.B.1); *Ghaly*, 739 F. Supp. 2d at 200.  Thus, the burden then shifts back to Askew to "show that retaliation was a

_____

[21]  To the extent that Askew intended to argue that the investigation into the Protestant conference was retaliatory, that argument is also unpersuasive because the investigation began over one year after Askew filed her DHR complaint.  (*See* Compl. ¶ 97; Dkt. No. 68, Attach. 8 at 47-50); *Ghaly v. U.S. Dep't of Agric.*, 739 F. Supp. 2d 185, 200 (E.D.N.Y. 2010) (stating that "when assessing causal connections based on temporal relationship, three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation . . . and six months between protected activity and discharge is well beyond the time frame for inferring retaliatory causation") (internal quotation marks, alterations and citations omitted)).

substantial reason for the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citations omitted). Because there is no proof that retaliation played any role in defendants' decisions, Askew's Title VII retaliation claim is also dismissed.

### 3. First Amendment Violations[22]

Askew's First Amendment claims are equally untenable. As the Circuit explained in *Williams v. Town of Greenburgh*:

> [A] plaintiff[] who allege[s] a violation of [her] right to free speech must prove that official conduct actually deprived [her] of that right. To prove this deprivation, [she] must come forward with evidence showing either that (1) defendants silenced h[er] or (2) defendants' actions had some actual, non-speculative chilling effect on h[er] speech.

535 F.3d 71, 78 (2d Cir. 2008) (internal quotation marks, alterations and citations omitted). Likewise, to prevail on her free exercise claim, Askew must "show that a state action sufficiently burdened h[er] exercise of religion." *Genas v. State of N.Y. Dep't of Corr. Servs.*, 75 F.3d 825, 831

---

[22] It is unclear from Askew's submissions whether she actually sought to state a First Amendment retaliation claim as opposed to a straightforward deprivation claim. (*See, e.g.*, Dkt. No. 76, Attach. 1 at 9-10.) To the extent she meant to plead a cause of action for retaliation, that claim would still fail. To prevail on her First Amendment retaliation claim, Askew "must establish that: (1) h[er] speech or conduct was protected by the First Amendment; (2) the defendant[s] took an adverse action against h[er]; and (3) there was a causal connection between this adverse action and the protected [activity]." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011). Here, there is no evidence that defendants took any adverse action against Askew, or that any action that they did take was causally connected to Askew exercising her First Amendment rights.

(2d Cir. 1996) (citing *Sherbert v. Verner*, 374 U.S. 398, 403 (1963)).  Here, Askew alleges that she was not approved to "speak or participate in Protestant faith and community activities throughout the state" in her official capacity as an MPC.  (Compl. ¶¶ 63-65; Dkt. No. 72 at 27.)  Notably, Askew does not claim that she herself—that is, as an individual—was unable to practice her faith or was silenced.  (*See generally* Compl.)  Thus, Askew's claim is essentially that DOCS refused to compensate her, in one form or another, for attending or speaking at conferences that it determined had no benefit to it.[23]  (*See* Defs.' SMF ¶ 155; Dkt. No. 68, Attach. 4 ¶¶ 9, 11.)  Because the court is unaware of any law which requires DOCS to do so,[24] Askew's First Amendment claims are dismissed.

### 4. Monell Claims

In light of the court's decision that there were no constitutional violations, Askew's cause of action for municipal liability fails as a matter of law.  *See, e.g.*, *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978).   As such, her remaining claims are dismissed.

---

[23] The fact that Askew needed permission to attend the events in question demonstrates that she was asked to do so in her official capacity as an MPC.  (*See* Dkt. No. 68, Attach. 3 at 50-51.)

[24] If Askew exercised her First Amendment rights, and was punished for doing so, the inquiry would be different.  *See Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008).

*5. Summary*

"Summary judgment is designed to pierce the pleadings to flush out those cases[, such as this one,] that are predestined to result in a directed verdict." *Lightfoot*, 110 F.3d at 907. Indeed, all of Askew's causes of action fail for the same reason—*i.e.*, the lack of evidence to substantiate them. *See Major League Baseball Properties*, 542 F.3d at 310 ("In order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles."). Though Askew was able to rest on her allegations in response to defendants' motion to dismiss, the same is not true now. *See Lightfoot*, 110 F.3d at 907. Instead, she was required, but ultimately failed, to "offer specific evidence showing that a genuine issue of material fact warrants a trial." *Wagner*, 827 F. Supp. 2d at 92. It follows that defendants' motion for summary judgment is granted, Askew's motion under Rule 12(c) is denied and her Complaint is dismissed.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No.

68) is **GRANTED**; and it is further

ORDERED that Askew's motion for judgment on the pleadings (Dkt. No. 72) and motion to amend her Complaint (Dkt. No. 84) are **DENIED**; and it is further

ORDERED that all of Askew's remaining claims are **DISMISSED**; and it is further

ORDERED that the Clerk shall enter judgment for defendants and close this case; and it is further

ORDERED that the Clerk provide a copy of this Memorandum-Decision and Order to the parties by certified mail.

**IT IS SO ORDERED.**

February 6, 2013
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court